Article 13 LLC v Ponce De Leon Fed. Bank (2025 NY Slip Op 06536)

Article 13 LLC v Ponce De Leon Fed. Bank

2025 NY Slip Op 06536

Decided on November 25, 2025

Court of Appeals

Wilson, Ch. J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 25, 2025

No. 96

[*1]Article 13 LLC, Respondent, Office of the New York State Attorney General, Intervenor-Respondent,
v
Ponce De Leon Federal Bank, et al., Defendants, Lasalle National Bank Association, Appellant.

Patrick G. Broderick, for appellant.
Anthony Filosa, for respondent.
Mark S. Grube, for intervenor-respondent.
American Legal and Financial Network, New York Bankers Association et al., United Jewish Organizations of Williamsburg, Inc., New York State Foreclosure Defense Bar, amici curiae.

WILSON, Chief Judge:
The United States Court of Appeals for the Second Circuit certified the following two questions of New York State Law for us to answer, pursuant to rule 500.27 of this Court (Rules of Ct of Appeals [22 NYCRR] § 500.27):
"1. Whether, or to what extent does, Section 7 of the Foreclosure Abuse Prevention Act, codified at N.Y. C.P.L.R. § 213(4)(b), apply to foreclosure actions commenced before the statute's enactment."
"2. Whether FAPA's retroactive application violates the right to substantive and procedural due process under the New York Constitution, N.Y. Const., art. I, § 6." (Art. 13 LLC v Ponce De Leon Fed. Bank, 132 F4th 586, 594 [2d Cir 2025]).
With respect to the first certified question, we hold that as the Legislature expressly stated, FAPA "shall take effect immediately and shall apply to all [foreclosure] actions in which a final judgment of foreclosure and sale has not been enforced" (L 2022, ch 821, § 10). We answer the second certified question in the negative.
I.
We summarize the facts briefly; they are set out more completely in the order of the United States Court of Appeals for the Second Circuit (see id. at 590-591). The events here stretch back to 2004, when JAJ Corp. bought the residential property located at 53 Van Buren Street in Brooklyn. In 2005, JAJ took out a loan secured by a mortgage, which was recorded in 2005. In September 2006, JAJ conveyed the property to Lisa Abbott; Ms. Abbott then took out a second mortgage from Alliance Mortgage Banking Corp. that same month. Those loans were replaced with a consolidated loan for $645,000 (the "Consolidated Loan") secured by a senior mortgage (the "Senior Mortgage"). As part of the consolidation, Ms. Abbot executed a promissory note in favor of Alliance. That same day, on September 18, 2006, Ms. Abbot took out another mortgage (the "Junior Mortgage"), junior to the Consolidated Loan, with MERS as nominee for Alliance, for $215,000. This Junior Mortgage was recorded simultaneously with the Senior Mortgage.
On January 31, 2007, the Consolidated Loan was sold to the Morgan Stanley Mortgage Loan Trust 2007-2AX, Mortgage Pass-Through Certificates, Series 2007-2AX (the "Trust"), which continues to own and hold the loan. The assignment of the Senior Mortgage to the Trust was recorded in March 2009. U.S. Bank, the successor of the named defendant, LaSalle National Bank Association, serves as trustee and document custodian for the Trust. Until July 31, 2008, Central Mortgage Company ("CMC") was the loan servicer for the Trust.
In February 2007, Ms. Abbott defaulted on the Consolidated Loan. In August 2007, CMC commenced, in its own name, a mortgage foreclosure action under the Consolidated Loan in Supreme Court. The complaint identified CMC as the holder of the Consolidated Loan. In May 2017, CMC moved to discontinue the 2007 action voluntarily and without prejudice; the Court granted CMC's motion in June 2017.
In 2020, Article 13 LLC acquired the Junior Mortgage and brought this quiet title action in the Eastern District of New York, seeking a judgment cancelling the Senior Mortgage as time-barred under the statute of limitations. Both parties moved for summary judgment, and in December 2022, the district court denied both cross-motions and held there was a disputed issue of material fact over whether CMC owned or held the consolidated note at the time it commenced the 2007 action (Art. 13 LLC v Ponce de Leon Fed. Bank, No. 20-CV-03553, 2022 WL 17977493, *5-7 [EDNY Dec. 28, 2022]).
Two days after the district court's ruling, the legislature enacted FAPA. Article 13 moved for reconsideration on the grounds that FAPA Section 7 applied and estopped U.S. Bank from attacking the validity of CMC's 2007 acceleration. The district court granted the motion, holding that FAPA controlled and applies retroactively (Art. 13, LLC v Ponce de Leon Fed. Bank, 686 F Supp 3d 212, 218-219 [EDNY 2023]). The district court likewise held that such retroactive application did not impair U.S. Bank's due process rights because it was supported by a "legitimate legislative purpose" (id.). The Second Circuit thereafter certified the two above questions to us.
II.
We begin with a very brief background to place FAPA in context. At the onset of the 2007 mortgage crisis, many lenders commenced foreclosure actions against defaulting homeowners, leading to "an unprecedented spike in judicial foreclosure actions" (Bank of New York Mellon v Gordon, 171 AD3d 197, 199 [2d Dept 2019]). However, because of the widespread securitization of residential mortgages that preceded the crisis, it became difficult to identify the party holding the note at the time a foreclosure action was commenced (see US Bank N.A. v Nelson, 36 NY3d 998, 1008 [2020] [Wilson, J., concurring]). For that and other reasons, including a glut of homes in which the borrower was in default, many lenders who initiated foreclosure actions failed to prosecute them to a final judgment and foreclosure sale. This created a "shadow inventory" of live foreclosure actions where judicial intervention was never requested, leaving many homeowners—who continued to reside in their homes—in a form of judicial "limbo" (Lawrence K. Marks, 2015 Report of the Chief Administrator of the Courts, Pursuant to Chapter 507 of The Laws of 2009, at 6 [2015], available at 
https://ww2.nycourts.gov/sites/default/files/document/files/2018-06/2015ForeclosureReport.pdf [last accessed Nov. 18, 2025]).
That wave of foreclosure actions, coupled with overall economic conditions, presented challenges for lenders. When a homeowner defaults on an installment payment, the six-year statute of limitations starts to run on that particular payment alone (CPLR 203 [a], 213 [4]; see also Freedom Mtge. Corp. v Engel, 37 NY3d 1, 21-22 & n 3 [*2][2021]). For more than a century, residential mortgage contracts have typically provided that, in the event of default, the lender has the option to accelerate the loan and sue to recover the entire principal and interest due (Engel, 37 NY3d at 20-22, citing Odell v Hoyt, 73 NY 343, 354 [1878]). But if a lender elects to accelerate the loan, the cause of action for the entire outstanding debt and interest accrues on that date, thus commencing the six-year statute of limitations (id.). When tens of thousands of foreclosure actions were initiated during the start of the crisis, the statute of limitations clock began to run. Holders of notes and mortgages often responded to this problem by filing successive foreclosure actions and arguing that prior actions were "null" on the basis that the party who brought the initial action (often, the lenders themselves or their predecessors) did not hold the note or mortgage (or could not prove as much) at the time the foreclosure action was filed (Senate Introducer's Mem in Support, Bill Jacket L 2022, ch 821 at 110).
The litigation sparked by the mortgage crisis culminated in a body of caselaw concerning the statute of limitations in foreclosure actions [FN1]. Eventually, in Engel our Court addressed whether a lender's voluntary dismissal of a foreclosure action constituted a "sufficiently 'affirmative act'" to revoke a prior acceleration (37 NY3d at 29 [internal citation omitted]). Observing that "no clear rule" had been previously established, we held that a "voluntary discontinuance [of a prior foreclosure action] evinces revocation of acceleration (absent a noteholder's contemporaneous statement to the contrary)" (id. at 32-33). With respect to the statute of limitations, we explained that a de-acceleration "return[ed] the parties to their pre-acceleration rights and obligations" (id. at 28). Therefore, when a noteholder de-accelerated a loan, the limitations period reset and reverted to running separately as to each installment payment missed by the borrower. If the mortgagor remained in default or defaulted thereafter, the noteholder could re-accelerate the loan, in which case "a new foreclosure claim on th[e entire] outstanding debt would accrue with a [new] six-year limitations period" (id.).
In 2022, the legislative term immediately following Engel, the legislature acted to overturn our decision and correct lower court decisions addressing the timeliness of foreclosure claims. The legislature determined that a "direct result" of Engel was lenders filing a "flurry of motions . . . to re-open cases, some having been dismissed years ago on statute of limitations grounds" (Senate Introducer's Mem in Support, Bill Jacket L 2022, ch 821 at 100). Legislators who introduced FAPA expressed concern that Engel would lead to "an overburdening of the judicial system and uncertainty on the part of innumerable homeowners currently trapped in an undue state of judicial purgatory" (id.) They also noted that the revival of "cases that should be barred by the statute of limitations" would exacerbate the pressure on a judicial system already under strain from COVID-19 (Assembly Introducer's Mem in Support, Bill Jacket L 2022, ch 821 at 9).
The legislature enacted FAPA less than two years after our decision in Engel. The Assemblymember introducing the bill explained it as addressing "ongoing . . . abuses of the judicial foreclosure process and lenders' attempts to manipulate statutes of limitations . . . exacerbated by recent court decisions" (Assembly Introducer's Mem in Support, Bill Jacket L 2022, ch 821 at 8). She further explained that FAPA would amend various provisions in the CPLR and the General Obligations Law to "clarify the existing law and overturn certain court decisions to ensure the laws of this state apply equally to all litigants, including those currently involved in mortgage foreclosure actions" (id.). The legislature also identified Engel and other decisions from our courts (e.g., Ramirez, 192 AD3d at 75 [addressing election of remedies provisions in RPAPL 1301]; Grover, 165 AD3d at 1542 [finding statute of limitations renewed by trial payments made as part of loan modification process]) as causing uneven application of the statute of limitations pertaining to residential mortgage loans, placing tens of thousands of homeowners in limbo.
III.
The first certified question asks whether and to what extent FAPA Section 7 applies to "foreclosure actions commenced before the statute's enactment." FAPA achieved its clear purpose with straightforward statutory text. The portion of Section 7 of FAPA at issue in this case is codified at CPLR 213 (4) (b):
"[A] defendant shall be estopped from asserting that the period allowed by the applicable statute of limitation for the commencement of an action upon the instrument has not expired because the instrument was not validly accelerated prior to, or by way of commencement of a prior action, unless the prior action was dismissed based on an expressed judicial determination, made upon a timely interposed defense, that the instrument was not validly accelerated."[FN2]
FAPA Section 10 then provides that "[t]his act shall take effect immediately and shall apply to all actions commenced on[, as relevant here, a residential mortgage loan agreement,] in which a final judgment of foreclosure and sale has not been enforced."
Given the plain language of the text, the real issue presented to us is one of timing: how does FAPA apply to pending or future foreclosure actions when a previous foreclosure action was dismissed for some reason other than "an expressed judicial determination, made upon a timely interposed defense, that the instrument was not validly accelerated?"
We generally presume that legislation applies prospectively (see In re Gleason (Michael Vee, Ltd.), 96 NY2d 117, 122 [2001] ["Amendments are presumed to have prospective application unless the Legislature's preference for retroactivity is explicitly stated or clearly indicated"]). That is so unless the statutory "language expressly or by necessary implication requires" retroactive application (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 584 [1998]).
When evaluating whether a statute overcomes this presumption, relevant factors include whether (1) the legislature has made a "specific pronouncement" with respect to retroactive effect or "conveyed a sense of urgency," (2) "the statute was designed to rewrite an unintended judicial interpretation" and (3) the statute "reaffirms a legislative judgment about what the law in question should be" (Gleason, 96 NY2d at 122). The statute's text and legislative history both properly inform our retroactivity analysis (see, e.g., Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583-586 [1998]; NYP Holdings, Inc. v New York City Police Dept., 43 NY3d 357, 363-364 [2025]).
Those factors support the conclusion that FAPA Section 7 applies retroactively. First, in FAPA Section 10, the legislature made a specific pronouncement not merely that FAPA would be effective immediately, but that it would apply to "all actions" commenced . . . in which a final judgment of foreclosure and sale has not been enforced (L 2022, ch 821, § 10). Thus, for all foreclosure actions as to which a final foreclosure sale had not been enforced prior to its effective date, including actions pending at the time of its effective date, FAPA unequivocally applies. As to all such actions, what remains is an inquiry (under FAPA Section 7) to determine whether "the prior action was dismissed based on an expressed judicial determination, made upon a timely interposed defense, that the instrument was not validly accelerated" (CPLR 213 [4]). If a prior such action was discontinued for any other reason, FAPA bars the holder of a note or mortgage from claiming that the statute of limitations has not expired "because the instrument was not validly accelerated" (id.).
As for Gleason's second and third factors, FAPA's legislative history and surrounding context make plain that FAPA was spurred by the legislature's "sense of urgency" and desire to reaffirm its "judgment about what the law in [*3]question should be" (Gleason, 96 NY2d at 122). The legislature acted swiftly and explicitly in response to Engel: FAPA was enacted less than two years after Engel, and the legislative history consistently emphasizes that Engel created an "urgent need" for legislative action to comport with what the legislature believed was the appropriate interpretation of longstanding law (Senate Introducer's Mem in Support, Bill Jacket L 2022, ch 821 at 98, 100 ["There is an urgent need to pass this bill to overrule the Court of Appeals' recent decision in Freedom Mtge. Corp, v Engel (37 NY3d 1 [2021])"]; Assembly Introducer's Mem in Support Bill Jacket L 2022, ch 821 at 8-9 [repeatedly explaining FAPA would "clarify the meaning of existing statutes" and "restore longstanding law that made it clear that a lenders' discontinuance of a foreclosure action that accelerated a mortgage loan does not serve to reset the statute of limitations"]; see also Senate Introducer's Mem in Support, Bill Jacket L 2022, ch 821 at 98; NY Assembly Debate on Assembly Bill A7737B, Mar. 23, 2022, at 9 [statement of Assemblymember Weinstein]). Further addressing FAPA's intended retroactive effect, the Senate Introducer's Memorandum in Support cited a portion of this Court's opinion in Gleason v Michael Vee, Ltd. (96 NY2d 117, 122-123 [2001]) discussing factors informing our retroactivity analysis and giving retroactive effect to an amendment (see Senate Introducer's Mem in Support, Bill Jacket L 2022, ch 821 at 16 n 6).
Thus, even if a prior foreclosure action was commenced by another party not in possession of the underlying note, and that action was discontinued without an express determination by the court that the instrument was not validly accelerated, the six-year statute of limitations accrued on the date that action was commenced and continued to run from that date, tollable only as provided for under FAPA.
IV.
A.
Because FAPA Section 7 applies retroactively in some circumstances, we come to the second certified question: whether such application violates both the substantive and procedural due process protections provided by our State Constitution (NY Const., art. I, § 6). We hold that it does not.
In the substantive due process context, we must necessarily begin with a careful description of "[t]he right asserted," as the protection afforded by due process depends on the nature of the protectible interest at hand (Myers v Schneiderman, 30 NY3d 1, 14 [2017]; cf. Reno v Flores, 507 US 292, 302 [1993] [federal substantive due process inquiry "must begin with a careful description of the asserted right, for 'the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field'"] [internal citations and brackets omitted]). U.S. Bank claims that retroactive application of FAPA impairs its "right to enforce its mortgage," but FAPA did not change the six-year statute of limitations applicable to mortgage foreclosure actions under CPLR 213 (4). The only relevant change effected by FAPA is that New York's estoppel doctrine, as now clarified by FAPA Section 7, precludes U.S. Bank from seeking to evade the statute of limitations by arguing that CMC's prior acceleration of the loan was invalid. Recognizing that FAPA did not alter the statute of limitations for foreclosure actions, U.S. Bank's asserted right is more accurately characterized as its right to contest the validity of the original foreclosure action that accelerated the mortgage. That claimed right is not contractual.
It is "well settled that acts of the [l]egislature are entitled to a strong presumption of constitutionality" (Matter of Chemung v Shah, 28 NY3d 244, 262 [2016] [internal quotation marks and citation omitted]). The party attacking the legislation bears "the ultimate burden of overcoming that presumption by demonstrating the [statute]'s constitutional invalidity" (American Economy Ins. Co. v State of New York, 30 NY3d 136, 149 [2017] [internal quotation marks omitted]). We hold that FAPA's application to this action passes constitutional muster.
Retroactive legislation can implicate substantive due process where it "takes away or impairs vested rights . . . in respect to transactions or considerations already past" (Landgraf, 511 US at 267 [internal citation omitted]). By definition, a "vested" right is one that has "become a completed, consummated right for present or future enjoyment" and is "absolute," "unconditional," and "not contingent" (Black's Law Dictionary [12 ed. 2024], vested). A right is not vested "absent a contractual arrangement or some other source for the claimed right" (Forti v New York State Ethics Com'n, 75 NY2d 596, 615 [1990]). This requires more than the existence of a statutory right that "the [l]egislature [is] free to reexamine" in the future" (id.). We have explained, for example, that "[a] potential litigant has no vested interest in, or right to, a specific limitations period" (Brothers v Florence, 95 NY2d 290, 300 [2000]). [*4]"Nor is there a vested right in the legislature's lack of legislation on a particular subject" or "in any rule of law or legislative policy that entitles the person to have such law or policy remain unaltered for their benefit" (20 NY Jur 2d, Constitutional Law § 318 [Aug. 2025 update]). In other words, a vested right is "something more than a mere expectation based upon an anticipated continuance of the existing law" (U.S. Mortg. & Trust Co. v Ruggles, 232 App Div 9, 13 [1st Dept 1931, quoting Sutherland on Statutory Construction (2d ed. 1904) § 283]).
When considering the asserted protectible interest—to challenge the validity of a foreclosure action allegedly commenced by a party that allegedly did not hold the note or mortgage—it is important to place that asserted interest into its practical context. Indeed, the "mere novelty" of a claimed right may give "reason enough to doubt that 'substantive due process' sustains it" (Reno, 507 US at 303 [internal citation omitted]). Such is the case here. First, typically, no foreclosure proceeding will accelerate the statute of limitations when a mortgagor continues to make installment payments, because each installment payment resets the statute of limitations (see General Obligations Law § 17-707). Second, when a mortgagor has defaulted, the mortgagee will know that it is not receiving the mortgagor's installment payments, putting the mortgagee on notice that the loan is in default and that the mortgagee may wish to take some action to protect its interest. Third, allegedly invalid foreclosure actions are almost always started in one of two ways: a party that has purchased a note and mortgage commences a foreclosure action before it has actually received the note, or a party that has purchased a note and mortgage cannot prove that it had actual possession of the note at the time it commenced the foreclosure action. The claimed protectible right in either case is the right to excuse the foreclosure plaintiff's own lack of diligence in ensuring and demonstrating that it had obtained or possessed the note when its action was filed [FN3]. In each of these scenarios, in practicality, FAPA Section 7 does not deprive the noteholder of the ability to protect its property interest.
Furthermore, in the years preceding FAPA's enactment, the laws and rules were repeatedly changed to mitigate certain recurring problems in residential foreclosure litigation. As of 2010, the Unified Court System required plaintiffs' counsel instituting a foreclosure action to affirm the factual accuracy of their pleadings (see Admin Orders of Chief Admin Judge of Cts AO/431/11, AO/548/10; see also Lawrence Marks, 2015 Report of the Chief Administrator of the Courts, at 6 [observing that "[i]n foreclosure cases commenced before [October 2010], many plaintiffs relied on documents 'robo-signed' by bank representatives who claimed to have personally reviewed thousands of documents in implausibly short periods of time"]). In 2013, the legislature enacted CPLR 3012-b, which requires counsel instituting a foreclosure action to certify that the named plaintiff had the note and mortgage in its possession at the time the action was commenced and requires the attachment of a copy of the note and mortgage to the complaint, showing proof of the plaintiff's ownership of those instruments (see L 2013, ch 306, § 1). Those changes made plain to noteholders—typically, highly sophisticated entities—that the laws and procedures surrounding foreclosure litigation were subject to change, including in response to the frequent commencement of foreclosure actions by entities whose timely possession of the underlying promissory note was not free from doubt. Against the backdrop of a "changing regulatory environment" (Gordon, 171 AD3d at 199) that often demanded more discipline by noteholders prosecuting foreclosure actions, U.S. Bank had no vested right, constitutionally shielded from legislative adjustment, to challenge the prior acceleration as invalid.
The alleged vested interest claimed by U.S. Bank is the right to wait long past the limitations period to challenge the validity of a foreclosure action that could have been challenged and refiled by the actual holder of the [*5]note and mortgage at any time during the six-year limitations period [FN4]. Moreover, U.S. Bank has failed to identify any caselaw recognizing a vested right in one's ability to collaterally challenge another's prior conduct where the party in question (or its predecessor) chose to sit on its rights—subjecting the borrower and court system to burdensome serial litigation and needlessly clouding the underlying property's title. U.S. Bank has also not pointed us to any caselaw recognizing a vested right in the way in which a doctrine like estoppel is applied.
The facts in the present case are typical: U.S. Bank does not dispute that its predecessor and it were aware of the prior action and in possession of the note throughout virtually the entire life of the prior foreclosure action. The protectible interest claimed—the right to challenge collaterally the validity of the prior foreclosure action—is neither vested nor impaired by FAPA in any meaningful sense. U.S. Bank, for example, could have discontinued the prior action within the six-year limitations period and commenced a new foreclosure action with the note and mortgage firmly in its possession.
B.
But even assuming that holders of notes and mortgages in a similar position to U.S. Bank had a protectible interest impaired by FAPA Section 7, the legislature may impair legally cognizable interests without running afoul of substantive due process. When a statute with retroactive effect faces a substantive due process challenge, it is our task to determine whether it has been shown that "the retroactive application of the legislation is itself justified by a rational legislative purpose'" (American Economy, 30 NY3d at 158, quoting Pension Benefit Guar. Corp. v R. A. Gray & Co., 467 US 717, 730 [1984]). That rational purpose must be "furthered by rational means" (United States v Carlton, 512 US 26, 30 [1994] [citation omitted]). The rational legislative purpose need not have been stated by the legislature: if there is "any conceivable legitimate State purpose," we must uphold the legislature's chosen policy (American Economy, 30 NY3d at 158, quoting Myers v Schneiderman, 30 NY3d 1, 15 [2017] [emphasis omitted]). The burden is on the challenging party to show the absence of such a purpose (Usery v Turner Elkhorn Min. Co., 428 US 1, 15 [1976] ["the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way"]).
Here, the legislature stated several rational purposes for FAPA's retroactive application. FAPA's legislative history identifies certain "abus[ive]" litigation practices engaged in by mortgage lenders and noteholders as the animating force behind FAPA's enactment: the sponsors' memoranda state "legislat[ive] find[ings]" to this effect (Assembly Mem. in Support, Bill Jacket, L 2022, ch 821, at 8; Senate Introducer's Mem., Bill Jacket, L 2022, ch 821, at 98). As we hold today in Van Dyke (3 NY3d at — [decided today]), "In light of the legislature's determination that these 'abuses' should be curtailed, it is rational for FAPA to apply retroactively to shield as many borrowers as possible from those practices." Without FAPA, the legislature worried, a "great number of foreclosure cases that would otherwise be time barred could proceed ad infinitum" (Senate Introducer's Mem. in Support, Bill Jacket L 2022, ch 821 at 101).
Moreover, the legislature also wanted to "relieve[] burdens on courts" owing to stale claims which defendants struggled to defend because such defenses "depend[ed] on information and documents . . . generally not in their possession" which the long passage of time had often rendered unavailable (id. at 101, 112). The legislature also sought to ensure that the statute of limitations under CPLR 213 (4) "appl[ied] equally to all litigants, including those currently involved in mortgage foreclosure actions" (Assembly Introducer's Mem. in Support, Bill Jacket L 2022, ch 821 at 8). That application to "current[]" actions necessarily required extinguishing claims dating back years or even decades that lenders had left dormant. Thus, the legislature stated several rational purposes for FAPA's retroactive application.
Furthermore, FAPA Section 7's retroactive application is "rationally related" (that is, neither arbitrary nor irrational) to FAPA's articulated ends (American Economy, 30 NY3d at 158; see Pension Benefits, 467 US at 733 [describing prohibition on legislation that is "arbitrary and irrational"]; Nebbia v New York, 291 US 502, 537 [1934] [similar]). Straightforwardly, FAPA Section 7 constricts parties' ability to challenge the validity of certain prior accelerations. Because holders of notes and mortgages often attempted to revive long-outdated claims, foreclosing such challenges is a rational means of achieving FAPA's goals of putting lingering claims to rest and relieving our congested court system.
That brings us to U.S. Bank's procedural due process claims. Invoking Brothers v Florence, U.S. Bank argues that because FAPA Section 7 modified the event that triggers the limitations period, our Court must therefore provide a "[r]easonable time" in which to file foreclosure actions that would be timely but for FAPA's application (95 NY2d 290, 302-303 [2000]). The rationale underlying Brothers cuts against U.S. Bank's procedural due process arguments. In Brothers, our courts had previously imposed a six-year statute of limitations in nonmedical malpractice cases, whereas the legislature had intended for a stricter three-year statute of limitations to apply (id. at 304-305). After the legislature enacted a statutory amendment updating the statute of limitations to three years with immediate effect, we reasoned that where "a limitations period is statutorily shortened, or created where none existed before, [d]ue [p]rocess requires that potential litigants be afforded a 'reasonable time for the commencement of an action before the bar takes effect'" (id. at 300 [ellipsis omitted], quoting Terry v Anderson, 95 US 628, 632-633 [1877]). However, unlike the challengers in Brothers, FAPA did not alter the six-year statute of limitations whatsoever; the successive holders of the note and mortgage have had the full six-year limitations period in which to discontinue an improperly commenced foreclosure action and commence a new one lacking the prior infirmity. FAPA does not deny such persons what the litigants envisaged by Brothers lacked: a "reasonable opportunity to interpose the type of claim affected" (id. at 302).[FN5]
Accordingly, the first certified question should be answered in accordance with this opinion, and the second certified question should be answered in the negative.
Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, first certified question answered in accordance with the opinion herein and second certified question answered in the negative.
Opinion by Chief Judge Wilson. Judges Rivera, Garcia, Singas, Cannataro, Troutman and Halligan concur.
Decided November 25, 2025

Footnotes

Footnote 1: See, e.g., Wells Fargo Bank N.A. v Grover (165 AD3d 1541 [3d Dept 2018]); Bradley v New Penn Fin., LLC (198 AD3d 1273, 1274-1275 [4th Dept 2021]); Citi Mortgage, Inc. v. Ramirez (192 AD3d 70 [3d Dept 2020]); U.S. Bank MA. v Gordon (158 AD3d 832 ([2d Dept 2021] [interpreting savings provision of CPLR 205 (a)]); Bank of NY Mellon v Slavin (156 AD3d 1073 [3d Dept 2017] [same]); Deutsche Bank Natl Trust Co. v Gouin (194 AD3d 479 [1st Dept 2021] [same].
Footnote 2: Two other provisions added by FAPA, codified at CPLR 203(h) and GOL 17-105, prevent waivers or extensions of the statute of limitations for residential foreclosure actions or actions on a note secured by a residential mortgage, but do allow extension of the limitations period by a signed writing or by express statutory authorization (see L 2022, ch 921 §§ 3-4).
Footnote 3: See, e.g., U.S. Bank, N.A. v Adrian Collymore (68 AD3d 752, 754 [2d Dept 2009] [noteholder failed to demonstrate it held note or mortgage at time it commenced foreclosure action]); Wells Fargo Bank, NA v Burke (125 AD3d 765 [2d Dept 2015] [similar]); Bank of New York v Silverberg (86 AD3d 274, 275 [2d Dept 2011] [assignor of party who commenced foreclosure action never actually held the underlying note]); Aurora Loan Services, LLC v Taylor (25 NY3d 355, 361 [2015] [plaintiff disputing whether lender had "standing" to foreclose because lender lacked possession of mortgage at time foreclosure action commenced]); Van Dyke (3 NY3d at — [decided today] [note was apparently not assigned until months after foreclosure action was commenced]).
Footnote 4: Whether a holder of a note and mortgage who was unaware of a prior foreclosure action brought by a complete stranger to the note could raise an as-applied due process challenge to Section 7 of FAPA is not presented to us by the certified question.
Footnote 5: U.S. Bank's remaining contentions are not encompassed within the certified questions, and we do not reach them.